UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JOSE AGUILERA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO.: 2:10-CV-95-TLS |
| FLUOR ENTERPRISES INC., and TRS STAFFING SOLUTIONS INC., | ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment [ECF No. 66] filed by Defendant TRS Staffing Solutions Inc. on September 23, 2011. The Plaintiff filed a Response [ECF No. 73] to Defendant TRS's Motion on November 8. Defendant TRS filed its Reply [ECF No. 75] on December 6. For the reasons stated below, the Court will grant Defendant TRS's Motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Id.* at 249–50; *Doe v. R.R. Donnelley*

1

& *Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and informing the court of the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56.1(a) (stating that the movant must provide a "Statement of Material Facts" identifying the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56.1(b) (directing that a response in opposition to a motion for summary judgment "must include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary").

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp*., 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A material fact must be outcome determinative under the governing law. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Id*.

**STATEMENT OF FACTS**

The following facts are taken principally from the Plaintiff's Statement of Facts, with additional facts concerning Defendant TRS's stated non-discriminatory reason for firing the Plaintiff taken from Defendant TRS's Statement of Facts. The Court has noted where disputes exist between the parties, accepts as true, for purposes of resolving this Motion, the Plaintiff's allegations where supported by evidence in the record, and makes all reasonable inferences in his favor.

On May 27, 2008, the Plaintiff began his position as Material Coordinator at "12 Pipe Still," one part of a BP refinery construction project in Whiting, Indiana, on which Defendant Fluor served as contractor. Defendant TRS Staffing Solutions is a staffing company that provides services to Defendant Fluor. The Plaintiff worked as an employee of Defendant TRS assigned to work for Defendant Fluor on the BP refinery project in Whiting. As Material Coordinator for 12 Pipe Still, the Plaintiff's duties included requesting needed construction materials from onsite warehouses and ensuring efficient and expedited delivery of those materials. The Plaintiff was supervised by Robert Callahan, 12 Pipe Still Project Manager, and Bob Ross, Warehouse Manager. On or about December 1, 2008, Defendant Fluor hired Jim Ambrose as Warehouse Supervisor. Ambrose was recommended for the position by Callahan. Ambrose also reported to Ross. Ambrose is Caucasian and the Plaintiff is Hispanic.

The Plaintiff testified in his deposition that, soon after beginning his employment with Defendant Fluor, Ambrose made false allegations to Ross that the Plaintiff failed to follow proper procedures in the warehouse. Ross did not see anything wrong with the Plaintiff's performance and he was never disciplined for any infractions.

The Plaintiff began complaining to Ross about Ambrose as early as December 2008, including at least two complaints during that month. The Plaintiff complained that Ambrose was "degrading" and "belittling him" and the Plaintiff felt that he was a "target." (Pl.'s Dep. 41–42, ECF No. 64-1.) Ross told the Plaintiff that "there was nothing he [could] do." (*Id*. 41.) In February or March 2009, the Plaintiff stated to Ross that Ambrose was "discriminative" in how Ambrose treated the Plaintiff. (*Id*. 45). Ross told the Plaintiff to "keep on doing [his] job." (*Id*.). Sometime in early 2009, the Plaintiff also approached Callahan to report that Ambrose was "giving [him] a hard time in the warehouse" and that he "was working in a hostile environment." (*Id*. 40–41).

In late March 2009, the Plaintiff complained to Harold Johnson in Defendant Fluor's Human Resources department about the treatment he was receiving from Ambrose and told Johnson he was "being discriminated against, harassed, belittled" and was "working in a hostile environment." (*Id.* 64–66, ECF No. 64-1.) Johnson suggested to the Plaintiff that he write out his complaints and give them to Johnson. (*Id*. 66.) The Plaintiff filed a written complaint on March 27, 2009 (the "March Complaint"), with Defendant Fluor's Human Resources department recounting some of the incidents between himself and Ambrose. (*Id.* 61). The Plaintiff wrote:

> I'm writing to inform you of incidents that I have been having with a fellow co-worker, Jim Ambrose. As of November of 2008, Jim Ambrose was hired on board the Whiting OCC project with Fluor. A few of the incidents are as follows:
> - I went to discuss piping materials with Jim & he approached me with an attitude and he spoke to me as if I were lower than him. He tried to intimate and degrade me. [Later dated by the Plaintiff as having occurred on December 15, 2008.]
> - Another incident occurred when my boss, Bob Ross, pulled me into his office and expressed to me, in anger, my work ethic because Jim lied to him and told him that I was having craft pull materials for me, which were false accusations. [Later dated by the Plaintiff as having occurred on February 26,

2009.]
- The following day I called Jim into Bob's office and shared with the two of them that I felt Jim had a personal problem with me. I told Bob that I was tired of how Jim approached me and spoke to me. Bob told me that he cannot do anything and that it will be fine. I mention[ed] that I know he knows Rick Hudgens [Deputy Construction Manager] and that I feel it is wrong how he is using his authority in the wrong way just because he knows Rick. Jim says he has no problem with me and I truly disagree so I try to make peace due to the fact that I don't want any problems. The next day I sent an email stating that I know what my job duties are and that I would never go around authority and do things out of my work requirement and that I enjoy my job and want to be a part of this project. [Later dated by the Plaintiff as having occurred on March 2, 2009.]
- Another time I went to the warehouse to identify embedded plates for my pillar, when Jim approached me saying "He's tired of this crap." I told him it was not my fault that the vendor mis-fabricated some materials & that these situations would sometimes arise. [Later dated by the Plaintiff as having occurred on March 9, 2009.]
- Another time I informed Jim that a US pipe representative was coming to show the craft what materials go with what. He told me in an unprofessional manner "You only have 10 minutes to show the craft what they need to do." I told him I would do the best I could. I proceeded next door with the craft when a gentleman . . . angrily approached me saying that Jim is handling things in a very unprofessional manner, with anger and yelling. [Later dated by the Plaintiff as having occurred on March 10, 2009.]
- Another incident was when I went to the warehouse and I asked Jim about a map for the lay-down yard . . . and he replied with attitude "Don't worry about it. What do you want? What are you doing here?" I told him that BP officials would be coming out to look at materials and I was trying to locate the materials . . . . He th[e]n told me, "This is my material. Leave[.]" I replied, this is 12 Pipe Steel material and if you want to help me th[e]n you can help BP locate the material when they arrive. He responded, "What did you say? I'm gonna call Rick (Hudgens)" with an attitude and in a threatening manner. I replied, Jim I don't want to look foolish when BP comes out here to see their material & that I would like to have an idea of where it is, so Fluor would not look unprofessional and also that I was doing nothing wrong. Th[e]n he asked me for PO numbers & locations, which I gave . . . to him. . . . After that, I went to speak with Rick because I did not want Jim to go back and tell Rick lies about me and get me into trouble or fired. [Later dated by the Plaintiff as having occurred on March 18, 2009.]
- Another incident was when a form tech representative came to the warehouse & I had no idea he was there. I th[e]n called Joe Pease to let him know about the situation and asked him how I should handle it. Joe Pease told me to look

5

for Jim or Dan and I found Dan because Jim was not around. Dan and I escorted the representative through the warehouse. . . . Jim came to me and said he would like to see me in his office. He informed me that I should know better and let him know when someone arrives at the warehouse. I told Jim I had no idea that the representative was coming and that I did look for him but he was no where around. He th[e]n told me that Rick Hudgens told me that I should let him know when vendors are coming out. I replied, Rick only told me to inform him of BP representatives coming out. Jim also expressed that I have materials that are still there and asked why they were there and it should be out of there. I really don't see how that was my fault when I've done my part in making sure procedures are done and he was just trying to make me look bad in front of Wanda Rivera. [Later dated by the Plaintiff as having occurred on March 20, 2009.]

- Another incident was when I called Wanda Rivera to inform her about rebar material. Jim questioned Wanda as to why I was calling and what did I want. She felt fearful and threatened to why he was asking her such questions and responded, "Jim, he was just calling to inform me that materials were coming and OS and D's were needed to be done.["] [Later dated by the Plaintiff as having occurred on March 24, 2009.]
- Another incident was when I called Elizabeth for information and she was scared to assist me due to the fact that Jim might get mad at her. [Later dated by the Plaintiff as having occurred on March 27, 2009.]

I feel that Jim is making people feel they are working in a hostile environment. They are scared and threatened by him and are cautious when it comes to assisting me because they feel their jobs could be in jeopardy. I am at the point where I can not perform my work well because I feel he is harassing me every chance he gets. I would like for Management to do something about this as soon as possible. He is not working at a professional level at all[.] He is causing fear, intimating, and . . . causing people to feel that they are under a hostile environment. Since his arrival he has caused two individuals to lose their jobs. I felt their job loss was uncalled for and they [were] set up by Jim. He is a manipulator and a schemer and most definitely a liar when it comes to admitting the truth. Jim is out for himself and is trying to make himself look good by intimating and putting fear into people for his own recognition. I also believe he is using his authority in a wrong way due to his relationship with Rick Hudgens . . . . I have witnesses willing to testify against him, but they are scared to be known because they fear they will lose their jobs.

(March Compl., Pl.'s Dep. Ex.7, ECF No. 64-2 at 27–29.)

In addition to the incidents described in the March Complaint, the Plaintiff relies on the following incidents. The Plaintiff testified that sometime after he gave the March Complaint to

6

Defendant Fluor but before he learned he was being fired on April 2, Ambrose called the Plaintiff a "spic" as the two passed one another in the workplace.[1] (Pl.'s Dep. 57–58, ECF No. 64-1.) The Plaintiff did not inform Johnson or Callahan or any other Fluor representative of this incident until after he left his employment with Defendant Fluor and Defendant TRS. (*Id*. 57–60.) One of the Plaintiff's co-workers testified that he heard Ambrose refer to the Plaintiff as a "puta," a derogatory term in Spanish, at their work site. (Sashington Aff. ¶ 7, ECF No. 73-8.)[2] This same co-worker testified that he saw Ambrose's name on an email, though he could not recall if Ambrose had sent the email or was only a recipient, depicting a Mexican flag flying over an American flag burning on the ground with the caption: "Let's retaliate against all Mexicans." (*Id*. ¶ 10.) This individual also testified that he saw the Plaintiff's face cut out of, and the word "puta" written next to, a photo of the Plaintiff posted in the workplace. This individual also testified that he saw, posted in the workplace, a photo of the Plaintiff's face pasted inside a photograph of a bean. He interpreted this image as derogatory against the Plaintiff's Mexican ancestry. The Plaintiff testified that he saw Ambrose viewing the same anti-Mexican email in the workplace. While the record is not entirely clear, it appears that the Plaintiff did not see his face cut out of a photograph in the workplace with the word puta written next to it or the image of his face inside a photograph of a bean. The Plaintiff cites only to his co-worker's affidavit with regard to these two events rather than his own testimony, in which these events apparently are not discussed, indicating that he likely had no personal knowledge. (Pl.'s Resp. 4–6, ECF No.

---

[1] Ambrose testified that this incident did not take place.

[2] Ambrose testified that he did not call the Plaintiff a puta and does not know what the word means.

73.) The Plaintiff was not present when Ambrose called him a puta. The Plaintiff did not complain about any of these incidents to his superiors at Defendant Fluor or Defendant TRS.

In early 2009, BP instructed Defendant Fluor to slow construction work at the Whiting Project, create a plan for using available funds, and decide whether any project functions could be eliminated or consolidated. Construction Managers were required to examine which roles within their projects could be eliminated or consolidated with other projects. Defendant Fluor initiated five rounds of personnel reductions at the Whiting Project between March and July 2009 during which Defendant Fluor laid off 65 individuals. The record does not appear to indicate how many individuals worked for Defendant Fluor on the Whiting Project at the time.

Callahan testified that he made the decision to end the Plaintiff's assignment as part of the April personnel reduction because he was tasked with reducing employees on the 12 Pipe Still project. He believed the Plaintiff's job could be combined with another position. With regard to the timing of his decision to fire the Plaintiff he testified:

> Q: Do you know when you made the decision to let [the Plaintiff] go exactly?
> A: I would tell you three to four weeks before that –
> Q: Three or four week before April 2nd?
> A: Before he was let go.
> Q: Why do you think that?
> A: Because it takes me that long to go through the gyrations I have to go through before – to figure out who's the one I can live with the least. Okay? I mean it's not an easy decision. You don't just go throw a dot and after – you try and balance the budget . . . overhead, and you have to figure out an alternate method of still keeping the job going. So it takes some time.

(Callahan Dep. 56–57, ECF No. 64-5.) Callahan and Ambrose testified that Ambrose did not have input into Callahan's decision to fire the Plaintiff. (Callahan Dep. 40–46; Ambrose Dep. 52–53.)

On April 2, the Plaintiff met with Johnson and Callahan, and Callahan told the Plaintiff his assignment with Defendant Fluor was ending. Johnson told the Plaintiff that this decision had nothing to do with the March Complaint about Ambrose and that Defendant Fluor would be investigating his complaint. The Plaintiff continued in the same position until April 10, his last day of employment with Defendant Fluor. Defendant TRS ended the Plaintiff's employment on the same day.

On March 27, the date the Plaintiff filed the March Complaint, he also attempted to speak with someone in Defendant TRS's HR department, but that individual was not available.[3] The Plaintiff next contacted someone in Defendant TRS's HR department on April 3, 2009, the day after he learned he was being fired. He testified that he told Defendant TRS's HR department that he was being fired and that he felt it was because of discrimination and retaliation and that he had been a victim of harassment and asked for help getting his job back. The Plaintiff asserts in his Response that no action was taken by Defendant TRS to investigate the matter or to find another assignment for the Plaintiff. Defendant TRS, however, submitted affidavit testimony

---

[3] The Defendant's description of his attempt to contact Defendant TRS's HR personnel in his statement of facts is unclear and possibly unsupported by the evidence. The Defendant states in his Statement of the Facts that "On or about March 30, Plaintiff contacted Defendant's Corporate HR Department by telephone, in order to follow up on his complaint." (Pl.'s Resp. 4–5, ECF No. 73 (citing Pl.'s Dep. 153, ECF No. 67-1).) On the cited page of his deposition the Plaintiff was asked the question: "After you were notified you were being laid off from the Whiting site, you did call Joanne Becmer?" (Pl.'s Dep. 153, ECF No. 67-1.) He answered, "I called Barbara . . . She's the lady I said I would take money out of my own bank account to fly you in so you could save my job." (*Id.*) This page of his deposition does not support the contention that he spoke to someone in Defendant TRS's HR Department before he learned he would be fired by Defendant Fluor. Later in the same deposition the Plaintiff is asked "You did not . . . reach out to TRS until on or about April 3rd, at which time you already knew you had been laid off from the Whiting site, correct?" (*Id.* 156.) He answers, "No. I did reach out to TRS, but nobody was at their office." (*Id.*) He was then asked "So you never connected with anyone at TRS?" (*Id.*) He answers, "Right. I never connected with anybody." (*Id.*) Based on that testimony, the Court concludes that the Plaintiff did

from relevant individuals indicating that Defendant TRS's employees did look into the matter by following up with employees of Defendant Fluor to find out what led them to fire the Plaintiff and by investigating the circumstances of the March Complaint. One of these individuals testified that he looked into whether there were other positions available for the Plaintiff but found that there were none because of the layoffs taking place at that time. The Plaintiff did not designate any evidence contradicting this testimony.

On April 16, 2009, the Plaintiff filed a charge of discrimination with the EEOC. He received a right to sue letter on or about December 5, 2009. The Plaintiff initiated this action on February 24, 2010. The Plaintiff's Amended Complaint, filed on August 12, 2010, alleges two counts against Defendant TRS: 1) Violation of Civil Rights/Discrimination; 2) Retaliatory Discharge. Within the Plaintiff's count for discrimination he alleges that he was fired because of his race, that he was subjected to a hostile work environment, and that Defendant TRS was negligent in failing to protect him from racial discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Defendant TRS moves for Summary Judgment on all counts brought in the Amended Complaint.

## ANALYSIS

Defendant TRS argues that it is entitled to summary judgment on all of the Plaintiff's claims, and the Plaintiff argues that there are material factual issues for trial preventing summary judgment on any claim.

---

not complain to any employee of Defendant TRS about any of the allegedly racially-motivated incidents until after he learned his assignment with Defendant Fluor was ending.

### A. Hostile Work Environment

For a Title VII hostile work environment claim to survive summary judgment, a plaintiff must be able to show that 1) he was subject to unwelcome harassment; 2) the harassment was based on his race; 3) the harassment was severe or pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is basis for employer liability. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004).[4] If an individual with managerial authority created the hostile work environment, the employer can be held strictly liable. *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009)); *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004). But, if a co-worker created the hostile work environment, an employer must have been "negligent in discovering or rectifying the harassment" to be liable. *Berry*, 618 F.3d at 692 (citing *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009)).

The Court will only analyze the fourth element, a basis for employer liability, in this case because the Plaintiff failed to put forward any evidence to prevent summary judgment against him on this issue. A reasonable jury could not find a basis for employer liability against Defendant TRS because the Plaintiff never told employees about the perceived harassment until

---

[4] The Court notes that some more recent Seventh Circuit cases formulate the elements as follows: "(1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). Any distinction between this formulation and that cited by the parties has no impact on the analysis in this case.

11

after he learned he was being fired and has not put forward any evidence indicating that Defendant TRS otherwise knew or should have known about any of the alleged incidents. Defendant TRS's employees were in no position to learn of the perceived harassment without a complaint from the Plaintiff. He did not alert them to the perceived harassment until April 3, at which time he had already learned he was to be fired from his position with Defendant Fluor. Defendant TRS then looked into the matter and found no wrongdoing. But, in the end, there was nothing they could do to end the harassment when the Plaintiff's employment had already been terminated.

The Plaintiff appears to argue his case as if Defendant Fluor and Defendant TRS are the same company, and the knowledge of employees of one can be imputed to the other. However, he has put forward no evidence contradicting that submitted by Defendant TRS that it and Defendant Fluor are separate corporate entities. Nor has he presented some other basis otherwise indicating that they should be treated as one and the same.[5] As the Plaintiff has put forward no evidence that Defendant TRS knew or should have known about the events he asserts amounted to racial harassment at a time when it could have done something about that conduct, the Court finds there is no basis for holding it liable for that alleged harassment. Accordingly, the Court will grant Defendant TRS's motion for summary judgment with regard to the Plaintiff's hostile work environment claim.

---

[5] The Court is aware that Title VII permits some theories of liability that pierce corporate veils or otherwise impute liability from one employer to another. *See Papa v. Katy Indus., Inc*., 166 F.3d 937, 940–42 (7th Cir. 1999) (explaining theories of transferring liability from one employer to another in the Title VII context); *E.E.O.C. v. RJB Props., Inc*., No. 10 C 2001, 2012 WL 1405728, at *45 (N.D. Ill. Apr. 23, 2012) (relying on and discussing *Papa*). However, the Plaintiff has not argued any theory to make this leap and the Court will not attempt to construct such an argument for him.

## B. Title VII Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). When asserting a charge of retaliation under Title VII, a plaintiff may proceed under the direct or indirect method of proof. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method of proving retaliation, a plaintiff must present either direct or circumstantial evidence showing that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) a causal connection exists between the protected activity and the adverse action. *Id*. Under the indirect, burden-shifting method, a plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered an adverse action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*

Under both the direct and indirect methods, if an employer "presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment." *Stone v. City of Indianapolis Pub. Utilities Div*., 281 F.3d 640, 644 (7th Cir. 2002); *see Magyar v. Saint Joseph Reg'l Med. Ctr.,* 544 F.3d 766, 773 (7th Cir. 2008) (under the direct method "summary judgment in favor of defendant is required when defendant presents 'unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no

13

retaliatory motive'") (quoting *Stone*, 281 F.3d at 644).

In this case Defendant TRS has presented unrebutted evidence that it would have taken the same action even if it had had no retaliatory motive. Indeed, no evidence before the Court suggests that Defendant TRS had a retaliatory motive. Defendant TRS submits evidence, uncontradicted by the Plaintiff, that it fired him from his employment because Defendant Fluor ended his assignment. Defendant TRS learned of the Plaintiff's complaints against Ambrose on the same day that it learned his was losing his position at the Whiting Project. Defendant TRS then, following its usual practice, looked into whether other assignments were available, found none, and fired the Plaintiff because it had no work for him. The Plaintiff presents no evidence that Defendant TRS actually adhered to some other practice or that other individuals who were let go from the Whiting Project were kept on by Defendant TRS. He presents no evidence otherwise contradicting Defendant TRS's stated reasoning for firing him. Because the Plaintiff did not present evidence contradicting Defendant TRS's stated reason for his firing and Defendant TRS did not learn about his complaints until after the decision had been made to fire him from his position with Defendant Fluor, the Court will grant summary judgment on the Plaintiff's Title VII retaliation claim.

C.     **Title VII Discrimination**

The Plaintiff argues that he was discriminated against on the basis of race and sets out his case under both a direct and indirect method. The Plaintiff's Response weaves together argument concerning retaliation and direct discrimination and direct and indirect methods of proof. Importantly, near the end of his brief the Plaintiff states, in a section concerning whether

Defendant TRS's reasons given for the firing were pretextual, that he "asserts that [Defendant TRS's] argument is mere pretext and that the REAL cause of [the] Plaintiff's termination was retaliation, and that he would not have been subject to the lay-offs BUT FOR having complained about Ambrose's harassment and discrimination." (Pl.'s Resp. 17, ECF No. 73.) The Plaintiff does not appear to argue that the real cause of his termination was his race (as an alternate theory) but rather, in his discussion of pretext, he alleges that the basis was his complaints made about Ambrose's harassment.

The Plaintiff provides no theory and no evidence to tie Ambrose's conduct or that of unknown individuals to Defendant TRS's decision to fire him. Nevertheless, he argues that he was fired on the basis of his race under a direct and an indirect method of proof. None of the Plaintiff's evidence showed any racial bias on the part of any of Defendant TRS's employees; all evidence offered by the Plaintiff concerning allegedly racially motivated conduct related either to actions by Ambrose or by unknown individuals on the Whiting Project site. Therefore, the Court concludes that he either waived or failed to provide evidence supporting his claim of racial discrimination under the direct method.

Under the indirect method of proof, Defendant TRS argues that it has put forward a non-discriminatory basis for his firing and that the Plaintiff must therefore indicate that this reason is pretextual. *See Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915–16 (7th Cir. 2007) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)); *see also Larson v. Portage Twp. Sch. Corp.*, 293 F. App'x 415, 418–19 (7th Cir. 2008) ("[W]here an employer offers a legitimate, nondiscriminatory reason for firing an employee, it simply 'doesn't matter' whether the plaintiff presented a prima facie case of discrimination.") (quoting *Brewer*, 479 F.3d at 915–

16). Defendant TRS asserts, as its non-discriminatory basis for firing the Plaintiff, that it has a practice of firing those individuals whose assignments are terminated if there are no available positions in the same geographic area and that the Plaintiff's assignment was terminated and there were no other positions available.

To counter Defendant TRS's non-discriminatory basis, the Plaintiff argues: that the reason for his firing was his "having complained about Ambrose's harassment and discrimination," that the record shows he was replaced by an individual outside his protected class, who left the consolidated job not long after beginning, that this individual's replacement was also outside the Plaintiff's protected class, and that there is no documentary evidence supporting Defendant Fluor's explanation for when and why it fired him. (Pl.'s Resp. 17–18, ECF No. 73.) None of these facts, if proven, would indicate that Defendant TRS's reasons for firing the Plaintiff are untrue. If Defendant Fluor made its decision to fire the Plaintiff for illegitimate reasons, then the Plaintiff is entitled to bring, as he did in this same case, a cause of action against it. But he has presented the Court with no theory supporting an extension of that liability to Defendant TRS in this case and presented no evidence indicating that Defendant TRS's employees were untruthful in their stated reasons for ending his employment. The Court will grant Defendant Fluor's Motion with regard to the Plaintiff's claim of discrimination under Title VII.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant TRS's Motion for Summary Judgment [ECF No. 66]. The Court CONFIRMS a Telephonic Status Conference to be held on

August 2, 2012, at 2:30 PM before Judge Theresa L. Springmann. The Court will initiate the call.

SO ORDERED on July 30, 2012.

                              s/ Theresa L. Springmann
                             THERESA L. SPRINGMANN
                             UNITED STATES DISTRICT COURT
                             FORT WAYNE DIVISION