**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

JOSE AGUILERA,                                                )
                                                             )
      Plaintiff,                          )
                                                             )
      v.                                  )      CAUSE NO.: 2:10-CV-95-TLS
                                                             )
FLUOR ENTERPRISES INC., and                                  )
TRS STAFFING SOLUTIONS INC.,                                 )
                                                             )
      Defendants.                         )

**OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment [ECF No. 63] filed

by Defendant Fluor Enterprises Inc. on September 23, 2011. The Plaintiff filed a Response [ECF

No. 72] to Defendant Fluor's Motion on November 8. Defendant Fluor filed its Reply [ECF No.

74] on December 6. For the reasons stated below, the Court will grant in part and deny in part

Defendant Fluor's Motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate if the facts supported by materials in the record show

that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no

rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the

evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead

to determine whether there is a genuine issue of triable fact. *Id.* at 249–50; *Doe v. R.R. Donnelley*

*& Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and informing the court of the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56.1(a) (stating that the movant must provide a "Statement of Material Facts" identifying the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56.1(b) (directing that a response in opposition to a motion for summary judgment "must include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary").

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp*., 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A material fact must be outcome determinative under the governing law. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Id.*

## STATEMENT OF FACTS

The following facts are taken principally from the Plaintiff's Statement of Facts, with additional facts concerning Defendant Fluor's stated non-discriminatory reason for firing the Plaintiff taken from Defendant Fluor's Statement of Facts. The Court has noted where disputes exist between the parties, accepts as true, for purposes of resolving this Motion, the Plaintiff's allegations where supported by evidence in the record, and makes all reasonable inferences in his favor.

On May 27, 2008, the Plaintiff began his position as Material Coordinator at "12 Pipe Still," one part of a BP refinery construction project in Whiting, Indiana, on which Defendant Fluor served as contractor. Defendant TRS Staffing Solutions is a staffing company that provides services to Defendant Fluor. The Plaintiff worked as an employee of Defendant TRS assigned to the work for Defendant Fluor on the BP refinery project in Whiting. As Material Coordinator for 12 Pipe Still, the Plaintiff's duties included requesting needed construction materials from onsite warehouses and ensuring efficient and expedited delivery of those materials. The Plaintiff was supervised by Robert Callahan, 12 Pipe Still Project Manager, and Bob Ross, Warehouse Manager. On or about December 1, 2008, Defendant Fluor hired Jim Ambrose as Warehouse Supervisor. Ambrose was recommended for the position by Callahan. Ambrose also reported to Ross. Ambrose is Caucasian and the Plaintiff is Hispanic.

The Plaintiff testified in his deposition that, soon after beginning his employment with Defendant Fluor, Ambrose made false allegations to Ross that the Plaintiff failed to follow proper procedures in the warehouse. Ross did not see anything wrong with the Plaintiff's performance and he was never disciplined for any infractions.

The Plaintiff began complaining to Ross about Ambrose as early as December 2008, including at least two complaints during that month. The Plaintiff complained that Ambrose was "degrading" and "belittling him" and the Plaintiff felt that he was a "target." (Pl.'s Dep. 41–42, ECF No. 64-1.) Ross told the Plaintiff that "there was nothing he [could] do." (*Id*. 41.) In February or March 2009, the Plaintiff stated to Ross that Ambrose was "discriminative" in how Ambrose treated the Plaintiff. (*Id*. 45). Ross told the Plaintiff to "keep on doing [his] job." (*Id*.). Sometime in early 2009, the Plaintiff also approached Callahan to report that Ambrose was "giving [him] a hard time in the warehouse" and that he "was working in a hostile environment." (*Id*. 40–41).

In late March 2009, the Plaintiff complained to Harold Johnson in Defendant Fluor's Human Resources department about the treatment he was receiving from Ambrose and told Johnson he was "being discriminated against, harassed, belittled" and was "working in a hostile environment." (*Id*. 64–66, ECF No. 64-1.) Johnson suggested to the Plaintiff that he write out his complaints and give them to Johnson. (*Id*. 66.) The Plaintiff filed a written complaint on March 27, 2009 (the "March Complaint"), with Defendant Fluor's Human Resources department recounting some of the incidents between himself and Ambrose.[1] (*Id*. 61). The Plaintiff wrote:

> I'm writing to inform you of incidents that I have been having with a fellow co-worker, Jim Ambrose. As of November of 2008, Jim Ambrose was hired on board the Whiting OCC project with Fluor. A few of the incidents are as follows:
> - I went to discuss piping materials with Jim & he approached me with an

---

[1] Defendant Fluor asserts that the Plaintiff stated the March Complaint contained all his material contentions while the Plaintiff asserts that it contained only some. The Court finds that this dispute is not material and would in any event accept the Plaintiff's view that it listed only some of the incidents as the Plaintiff stated in the Complaint that he is describing a "few of the incidents," which implies that there were additional similar incidents that he did not list.

attitude and he spoke to me as if I were lower than him. He tried to intimate and degrade me. [Later dated by the Plaintiff as having occurred on December 15, 2008.]

- Another incident occurred when my boss, Bob Ross, pulled me into his office and expressed to me, in anger, my work ethic because Jim lied to him and told him that I was having craft pull materials for me, which were false accusations. [Later dated by the Plaintiff as having occurred on February 26, 2009.]

- The following day I called Jim into Bob's office and shared with the two of them that I felt Jim had a personal problem with me. I told Bob that I was tired of how Jim approached me and spoke to me. Bob told me that he cannot do anything and that it will be fine. I mention[ed] that I know he knows Rick Hudgens [Deputy Construction Manager] and that I feel it is wrong how he is using his authority in the wrong way just because he knows Rick. Jim says he has no problem with me and I truly disagree so I try to make peace due to the fact that I don't want any problems. The next day I sent an email stating that I know what my job duties are and that I would never go around authority and do things out of my work requirement and that I enjoy my job and want to be a part of this project. [Later dated by the Plaintiff as having occurred on March 2, 2009.]

- Another time I went to the warehouse to identify embedded plates for my pillar, when Jim approached me saying "He's tired of this crap." I told him it was not my fault that the vendor mis-fabricated some materials & that these situations would sometimes arise. [Later dated by the Plaintiff as having occurred on March 9, 2009.]

- Another time I informed Jim that a US pipe representative was coming to show the craft what materials go with what. He told me in an unprofessional manner "You only have 10 minutes to show the craft what they need to do." I told him I would do the best I could. I proceeded next door with the craft when a gentleman . . . angrily approached me saying that Jim is handling things in a very unprofessional manner, with anger and yelling. [Later dated by the Plaintiff as having occurred on March 10, 2009.]

- Another incident was when I went to the warehouse and I asked Jim about a map for the lay-down yard . . . and he replied with attitude "Don't worry about it. What do you want? What are you doing here?" I told him that BP officials would be coming out to look at materials and I was trying to locate the materials . . . . He th[e]n told me, "This is my material. Leave[.]" I replied, this is 12 Pipe Steel material and if you want to help me th[e]n you can help BP locate the material when they arrive. He responded, "What did you say? I'm gonna call Rick (Hudgens)" with an attitude and in a threatening manner. I replied, Jim I don't want to look foolish when BP comes out here to see their material & that I would like to have an idea of where it is, so Fluor would not look unprofessional and also that I was doing nothing wrong. Th[e]n he asked

me for PO numbers & locations, which I gave . . . to him. . . . After that, I went to speak with Rick because I did not want Jim to go back and tell Rick lies about me and get me into trouble or fired. [Later dated by the Plaintiff as having occurred on March 18, 2009.]

- Another incident was when a form tech representative came to the warehouse & I had no idea he was there. I th[e]n called Joe Pease to let him know about the situation and asked him how I should handle it. Joe Pease told me to look for Jim or Dan and I found Dan because Jim was not around. Dan and I escorted the representative through the warehouse. . . . Jim came to me and said he would like to see me in his office. He informed me that I should know better and let him know when someone arrives at the warehouse. I told Jim I had no idea that the representative was coming and that I did look for him but he was no where around. He th[e]n told me that Rick Hudgens told me that I should let him know when vendors are coming out. I replied, Rick only told me to inform him of BP representatives coming out. Jim also expressed that I have materials that are still there and asked why they were there and it should be out of there. I really don't see how that was my fault when I've done my part in making sure procedures are done and he was just trying to make me look bad in front of Wanda Rivera. [Later dated by the Plaintiff as having occurred on March 20, 2009.]

- Another incident was when I called Wanda Rivera to inform her about rebar material. Jim questioned Wanda as to why I was calling and what did I want. She felt fearful and threatened to why he was asking her such questions and responded, "Jim, he was just calling to inform me that materials were coming and OS and D's were needed to be done.["] [Later dated by the Plaintiff as having occurred on March 24, 2009.]

- Another incident was when I called Elizabeth for information and she was scared to assist me due to the fact that Jim might get mad at her. [Later dated by the Plaintiff as having occurred on March 27, 2009.]

I feel that Jim is making people feel they are working in a hostile environment. They are scared and threatened by him and are cautious when it comes to assisting me because they feel their jobs could be in jeopardy. I am at the point where I can not perform my work well because I feel he is harassing me every chance he gets. I would like for Management to do something about this as soon as possible. He is not working at a professional level at all[.] He is causing fear, intimating, and . . . causing people to feel that they are under a hostile environment. Since his arrival he has caused two individuals to lose their jobs. I felt their job loss was uncalled for and they [were] set up by Jim. He is a manipulator and a schemer and most definitely a liar when it comes to admitting the truth. Jim is out for himself and is trying to make himself look good by intimating and putting fear into people for his own recognition. I also believe he is using his authority in a wrong way due to his relationship with Rick Hudgens . . . . I have witnesses willing to testify against him, but they are scared to be known

because they fear they will lose their jobs.

(March Compl., Pl.'s Dep. Ex.7, ECF No. 64-2 at 27–29.)

In addition to the incidents described in the March Complaint the Plaintiff relies on the following incidents. The Plaintiff testified that sometime after he gave the March Complaint to Defendant Fluor but before he learned he was being fired on April 2, Ambrose called the Plaintiff a "spic" as the two passed one another in the workplace.[2] (Pl.'s Dep. 57–58, ECF No. 64-1.) The Plaintiff did not inform Johnson or Callahan or any other Fluor representative of this incident until after he left his employment with Defendant Fluor and Defendant TRS. (*Id.* 57–60.) One of the Plaintiff's co-workers testified that he heard Ambrose refer to the Plaintiff as a "puta," a derogatory term in Spanish, at their work site. (Sashington Aff. ¶ 7, ECF No. 72-8.)[3] This same co-worker testified that he saw Ambrose's name on an email, though he could not recall if Ambrose had sent the email or was only a recipient, depicting a Mexican flag flying over an American flag burning on the ground with the caption: "Let's retaliate against all Mexicans." (*Id.* ¶ 10.) This individual also testified that he saw the Plaintiff's face cut out of, and the word "puta" written next to, a photo of the Plaintiff posted in the workplace. This individual also testified that he saw, posted in the workplace, a photo of the Plaintiff's face pasted inside a photograph of a bean. He interpreted this image as derogatory against the Plaintiff's Mexican ancestry. The Plaintiff testified that he saw Ambrose viewing the same anti-Mexican email in the workplace. While the record is not entirely clear, it appears that the Plaintiff did not see his face

---

[2] Ambrose testified that this incident did not take place.

[3] Ambrose testified that he did not call the Plaintiff a puta and does not know what the word means.

cut out of a photograph in the workplace with the word puta written next to it or the image of his face inside a photograph of a bean. The Plaintiff cites only to his co-worker's affidavit with regard to these two events rather than his own testimony, in which these events apparently are not discussed, indicating that he likely had no personal knowledge. (Pl.'s Resp. 4–6, ECF No. 72.) The Plaintiff was not present when Ambrose called him a puta. The Plaintiff did not complain about any of these incidents to his superiors at Defendant Fluor.

In early 2009, BP instructed Defendant Fluor to slow construction work at the Whiting Project, create a plan for using available funds, and decide whether any project functions could be eliminated or consolidated. Construction Managers were required to examine which roles within their projects could be eliminated or consolidated with other projects. Defendant Fluor initiated five rounds of personnel reductions at the Whiting Project between March and July 2009 during which Defendant Fluor laid off 65 individuals. The record does not appear to indicate how many individuals worked for Defendant Fluor on the Whiting Project at the time.

Callahan testified that he made the decision to end the Plaintiff's assignment as part of the April personnel reduction because he was tasked with reducing employees on the 12 Pipe Still project. He believed the Plaintiff's job could be combined with another position. With regard to the timing of his decision to fire the Plaintiff he testified:

> Q: Do you know when you made the decision to let [the Plaintiff] go exactly?
> A: I would tell you three to four weeks before that –
> Q: Three or four week before April 2nd?
> A: Before he was let go.
> Q: Why do you think that?
> A: Because it takes me that long to go through the gyrations I have to go through before – to figure out who's the one I can live with the least. Okay? I mean it's not an easy decision. You don't just go throw a dot and after – you try and balance the budget . . . overhead, and you have to figure out an alternate

method of still keeping the job going. So it takes some time.

(Callahan Dep. 56–57, ECF No. 64-5.) Callahan and Ambrose testified that Ambrose did not have input into Callahan's decision to fire the Plaintiff. (Callahan Dep. 40–46; Ambrose Dep. 52–53.)

On April 2, the Plaintiff met with Johnson and Callahan, and Callahan told the Plaintiff his assignment with Defendant Fluor was ending. Johnson told the Plaintiff that this decision had nothing to do with the March Complaint about Ambrose and that Defendant Fluor would be investigating his complaint. The Plaintiff continued in the same position until April 10, his last day of employment with Defendant Fluor.

Johnson testified that he investigated the Plaintiff's March 27 complaint. On April 8, Johnson met with Ambrose and Callahan and interviewed Ambrose. During this meeting, Ambrose provided Johnson with facts underlying several of the interactions the Plaintiff had set forth in his March Complaint, which Ambrose said related to his belief the Plaintiff was not following warehouse procedures. Johnson testified that, based on the content of the Plaintiff's complaint and the information Ambrose provided, he could not substantiate the Plaintiff's complaints that Ambrose had violated company policy. Hudgens and Ambrose testified that Hugdens spoke with Ambrose about his communication style with all workers as a result of the March Complaint. Defendant Fluor had an anti-discrimination policy in place at all relevant times and policies in place for employees to complain about harassment in the workplace.

On April 16, 2009, the Plaintiff filed a charge of discrimination with the EEOC. He received a right to sue letter on or about December 5, 2009. The Plaintiff initiated this action on February 24, 2010. The Plaintiff's Amended Complaint, filed on August 12, 2010, alleges two

counts against Defendant Fluor: 1) Violation of Civil Rights/Discrimination; 2) Retaliatory

Discharge. Within the Plaintiff's count for discrimination he alleges that he was fired because of

his race, that he was subjected to a hostile work environment, and that Defendant Fluor was

negligent in failing to protect him from racial discrimination and harassment, in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Defendant Fluor moves for Summary

Judgment on all counts brought in the Amended Complaint.

## ANALYSIS

Defendant Fluor argues that it is entitled to summary judgment on all of the Plaintiff's

claims, and the Plaintiff argues that there are material factual issues for trial preventing summary

judgment on any claim.

### A.       Hostile Work Environment

For a Title VII hostile work environment claim to survive summary judgment, a plaintiff

must be able to show that 1) he was subject to unwelcome harassment; 2) the harassment was

based on his race; 3) the harassment was severe or pervasive so as to alter the conditions of the

employee's environment and create a hostile or abusive working environment; and 4) there is

basis for employer liability. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir.

2004).[4] If an individual with managerial authority created the hostile work environment, the

---

[4] The Court notes that some more recent Seventh Circuit cases formulate the elements as follows: "(1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). Because the parties do

employer can be held strictly liable. *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009)); *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004). But, if a co-worker created the hostile work environment, an employer must have been "negligent in discovering or rectifying the harassment" to be liable. *Berry*, 618 F.3d at 692 (citing *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009)). Defendant Fluor does not dispute the first element—that the Plaintiff was subject to unwelcome harassment—but does dispute the other three elements.

1.      *Basis for Employer Liability*

Because the Plaintiff seeks to combine together the effect of some workplace conduct for which he has a basis for employer liability, and some conduct for which he has no such basis, the Court will first analyze employer liability to determine which evidence may be considered in support of the Plaintiff's hostile work environment claim and then move on to whether the conduct was based on race[5] and whether it was severe or pervasive.

The Plaintiff's allegations of harassing and discriminative workplace conduct, excepting the incidents undertaken by anonymous persons, all center on Ambrose. The Plaintiff does not assert that Ambrose had managerial authority over him. Ambrose did not have "the power to directly affect the terms and conditions of the [P]laintiff's employment," so he was not the

---

not present argument over the first element, and because an analysis that included argument over the first element as elaborated in these later cases would not change the outcome, the Court will analyze only elements two, three, and four below.

[5] The Plaintiff stated in his deposition that his race, national origin, and color discrimination claims all stem from his being Hispanic. The Court will refer generally to these protected classes as "race."

Plaintiff's supervisor. *See Andonissamy v. Hewlett–Packard Co.,* 547 F.3d 841, 848 (7th Cir. 2008). Therefore, the Plaintiff must submit evidence that could support a jury finding that Defendant Fluor was negligent in failing to address harassment in the workplace. *Id.* (stating that to hold an employer "liable for failing to remedy a hostile work environment created by co-workers, [the employee] would need to demonstrate that he notified the employer about the harassment or that the harassment was so pervasive that a jury could infer his employer knew about it.").

As part of his hostile work environment claim, the Plaintiff seeks to hold Defendant Fluor liable for certain incidents that he never complained about until after he left his employment there. Because he did not tell Defendant Fluor about the incidents at a time when they could have acted on them and provides no evidence to support the contention that Defendant Fluor otherwise knew or should have known about these events, the Court will not permit him to use them to show negligence. *See Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 549 (7th Cir. 2011) (finding no employer liability for co-worker harassment where plaintiff did not take sufficient action to make employer aware of conduct and employer had a policy in place for complaints that plaintiff did not utilize); *Montgomery v. Am. Airlines, Inc.,* 626 F.3d 382, 391 (7th Cir. 2010) (same). In particular, there is no evidence the Plaintiff ever complained to anyone at Defendant Fluor about the bean photograph, the sending of the anti-Mexican email, or the alteration of his photograph. (Indeed, for the photograph-related incidents there is no evidence that he personally experienced the harassment or, if he did, when this took place.) There is similarly no evidence that his superiors already knew about these incidents or indication that they should have known or that there was no complaint procedure in place for him to utilize if he wanted to complain. His failure

to complain about these incidents meant that Defendant Fluor was not aware that it needed to take some action concerning these types of incidents such as investigate who was behind them. The Plaintiff cannot now tie these anonymous incidents to the complained of conduct by Ambrose, even if some connection could have been found at the time. Similarly, the Plaintiff never complained to his supervisors about Ambrose's "spic" comment, Ambrose's reference to the Plaintiff as a "puta" outside his presence, or Ambrose's viewing the anti-Mexican email. Again, the Court will not rely on these incidents to find negligence on the part of an unknowing employer. However, the Court must still consider whether the treatment he received from Ambrose that he did complain about created a hostile work environment, because if it did, Defendant Fluor could be found liable if it failed to take appropriate corrective action concerning that mistreatment. The Court will therefore consider whether the conduct complained about by the Plaintiff was racially-motivated, and whether it was severe or pervasive.

2.      ***Harassment Based on Race***

        The Plaintiff must next show that the conduct, for which Defendant Fluor could be found liable, was motivated by race. Although the Plaintiff need not show that the conduct against him was explicitly racist, it "must have a racial character or purpose to support a hostile work environment claim." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). The Plaintiff states in his brief that while the March Complaint "does not expressly state that Ambrose's conduct towards Plaintiff was explicitly racial, [the] Plaintiff felt that Ambrose spoke to him in a degrading manner because of his race." (Pl.'s Resp. 4, ECF No. 72.) In his deposition testimony, the Plaintiff stated that in his verbal complaints to his bosses he told them that Ambrose was

"discriminative" against him and that Ambrose "degraded" and "belittled" him and that he felt he was a "target." (Pl.'s Resp. 11.) Defendant Fluor argues that it cannot be held liable for any harassment against the Plaintiff because he never explicitly complained to them that Ambrose's conduct against him was motivated by his race. Defendant Fluor cites to cases indicating that "complaining of 'harassing' conduct is not enough." (Def. Fluor's Reply 9, ECF No. 74 (citing *Velez v. City of Chicago*, 442 F.3d 1043, 1048 (7th Cir. 2006).) And Defendant Fluor is correct that it cannot be held liable if it can show that its agents never realized, or never should have realized, that the Plaintiff was complaining about racially-motivated conduct. Nevertheless, a reasonable jury could infer that a Hispanic employee complaining about a white co-worker making him a "target," "belittling" him, discriminating against him, and forcing him to work in a hostile environment, could have meant racial discrimination or harassment. The Court will accept, without deciding, that the complaints made by the Plaintiff about Ambrose could have alerted Defendant Fluor to some racially-motivated conduct.

It is worth noting, however, that the Plaintiff himself, in the March Complaint, provided a non-race based explanation for Ambrose's treatment of him. The Plaintiff stated that Ambrose "is out for himself and is trying to make himself look good by intimating and putting fear into people for his own recognition." (March Compl., Pl.'s Dep. Ex.7, ECF No. 64-2 at 28.) By providing a non-racial explanation in his written complaint, the Plaintiff could have led his employer to reasonably believe that he was not complaining about racial harassment. However, a reasonable inference can be made, based on his testimony concerning his oral complaints, that he believed he was complaining about racial harassment in those complaints and that his employer could have understood those complaints in that context to mean racial harassment. The Court

will further consider the limited evidence supporting an inference that the conduct about which the Plaintiff complained had a racial character or purpose in its discussion of whether the harassment was severe or persuasive below.

The Plaintiff could also rely on the more racially-charged events to show that Ambrose's conduct he did complain about was motivated by a racial purpose. In addition to the context of his complaints and his relationship with Ambrose, the Court could allow evidence of the other conduct complained of by the Plaintiff related to Ambrose, namely Ambrose's viewing of the anti-Mexican emails, and Ambrose's use of slurs in reference to the Plaintiff once in the Plaintiff's presence and once outside his presence, to show that Ambrose's actions against the Plaintiff had a racial purpose, even though those same actions could not be used to find liability against the Plaintiff for failing to act on the harassment. The Court recognizes this distinction may cut a fine line, but a reasonable jury could find that Ambrose's use of slurs against the Plaintiff demonstrates that his workplace-related actions described by the Plaintiff were motivated by a racist purpose, and still be instructed that the some of that conduct—including the more overtly racial or racist incidents that Defendant Fluor did not learn about at the time— cannot be used directly as a basis for Defendant Fluor's liability for failing to act on Ambrose's treatment of the Plaintiff. The overall context of the Plaintiff's complaints about Ambrose, Ambrose's alleged treatment of him, and the racially-related incidents about which the Plaintiff did not complain, together could permit a reasonable jury to conclude that Ambrose's treatment of the Plaintiff had a racial purpose.[6]

---

[6] Defendant Fluor argues that the Plaintiff does not dispute that "Ambrose *believed* [the] Plaintiff was repeatedly violating [warehouse] procedures . . . the only reasonable inference is that Ambrose was

**3.** *Severe or Pervasive Harassment*

Finally, the Plaintiff "must show that the alleged harassment was both subjectively and objectively so severe or pervasive that it altered the conditions of his employment." *Yancick*, 653 F.3d at 544. "To determine whether an environment is objectively hostile or offensive, the court must consider all the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance." *Luckie*, 389 F.3d at 714.

Again, looking past the conduct the Plaintiff never complained about, the Court must determine whether Ambrose's actions could support a jury finding that the Plaintiff experienced severe or pervasive harassment. The Court accepts the Plaintiff's testimony that he subjectively believed that Ambrose's treatment of him created a hostile work environment and that he felt humiliated by it. However, he must also show that a reasonable person would have found Ambrose's treatment to be severe or pervasive harassment. The Plaintiff asserts that the conduct was severe or pervasive because of "Ambrose's severe hostility towards [him], Ambrose's unfounded accusations against [the] Plaintiff and [Defendant Fluor's] failure to take [the] Plaintiff's complaints about Ambrose seriously." (Pl.'s Resp. 10.) According to the Plaintiff's statement of facts, Ambrose took the following actions against him: "Ambrose made false allegations to Ross that Plaintiff failed to follow proper procedures. . . . Ambrose was degrading

---

motivated by [the] Plaintiff's perceived and repeated violations of warehouse procedures, not his race." (Def. Fluor's Reply 7, ECF No. 74.) The Court disagrees. The Plaintiff argues that Ambrose was motivated by the Plaintiff's race. More importantly, the evidence, viewed in the light most favorable to the Plaintiff, could establish a material issue of fact for a jury concerning Ambrose's motivations.

to him and belittle[ed] him and [the] Plaintiff felt that he . . . was a target. " (*Id.* 3 (citations and quotations marks omitted).) The Plaintiff also relies on his deposition testimony in arguing that he "felt that Ambrose spoke to him in a degrading manner because of his race." (*Id.* 4.) The Plaintiff indicates that, with regard to the false complaints Ambrose made, "Ross did not see anything wrong with [the] Plaintiff's performance and [the] Plaintiff was never disciplined for any infractions." (*Id.* 3.) The Court assumes, although he does not explicitly argue it, that the Plaintiff further intends to rely on the statements he made in the March Complaint to substantiate his claims that Ambrose's conduct against him constituted severe or pervasive harassment.

Ambrose's objective conduct, viewed in the light most favorable to the Plaintiff, included: making a false report to a supervisor about alleged conduct for which the Plaintiff was not disciplined; speaking to the Plaintiff in an angry and threatening manner in the workplace; talking down to the Plaintiff; cursing at the Plaintiff in the context of workplace disagreements; telling the Plaintiff he was "tired of this crap" in reference to workplace problems that were not the Plaintiff's fault; creating various workplace related problems for the Plaintiff including giving him unreasonably short periods of time to access staff or materials under Ambrose's control; creating friction between the Plaintiff and other employees by inquiring angrily into work related conversations between the Plaintiff and other staff; making other employees cautious about helping the Plaintiff because it would anger Ambrose; and using his personal relationship with a supervisor to his advantage and to the disadvantage of the Plaintiff and other employees. (*See* March Compl., Pl.'s Dep. Ex.7, ECF No. 64-2 at 27; Pl.'s Dep. 39–46, 52, ECF No. 64-1.)

The type of conduct described here, even if the Plaintiff believed it to be racially

motivated, and even if it had some racial purpose, was not severe or pervasive harassment actionable under the statute. The petty and obnoxious behavior of the type described by the Plaintiff does not constitute severe harassment. Although the Plaintiff describes Ambrose as speaking to him in a "threatening manner," acting "very unprofessionally," and trying to make the Plaintiff "look bad" in front of other employees, a reasonable person experiencing the conduct described would be not be physically threatened or humiliated by it. This is true particularly because the conduct described does not rise above the daily inconveniences faced by having to work with an intransigent, annoying, and conniving co-worker. The conduct described, including yelling at the Plaintiff and making the Plaintiff look as if he had violated some workplace rule, in front of others, when he had not violated the rule, or there was cause for exception to the rule, does not reach the level of objectively humiliating or otherwise constitute a hostile work environment found actionable in the case law. *Compare Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (reversing summary judgment for employer where an employee "endured a workplace environment filled with slurs and graffiti based on his race and national origin"), *and Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 694 (7th Cir. 2001) (finding actionable hostile work environment based on sex even though the harassment was "not of a sexual nature" because "it was directed at the terms and conditions" of plaintiff's employment including "questioning her abilities and the ability of women to do her job in general, plotting to give her job to a male custodian, [and] increasing her duties in an attempt to make her quit"), *with E.E.O.C. v. RJB Props., Inc*., No. 10 C 2001, 2012 WL 1405728, at *27 (N.D. Ill. Apr. 23, 2012) (finding "demeaning and obnoxious" behavior not actionable because it amounted to "'normal workplace friction' that is not actionable under Title VII") (quoting *Herron v.*

*DaimlerChrysler Corp*., 388 F.3d 293, 303 (7th Cir. 2004)).

Similarly, Defendant Fluor presents evidence from co-workers indicating that Ambrose was an "an equal opportunity bully," meaning he treated individuals outside the Plaintiff's protected class in the same insulting and annoying manner. (Sanchez Dep. 52–53, ECF No. 64-16.) *See Yancick*, 653 F.3d at 546 (considering evidence that a co-worker was "an equal opportunity bully"). [check ital.?] The Plaintiff does not present evidence contradicting Defendant Fluor's evidence that Ambrose was generally difficult to work with or that Defendant Fluor employees counseled him on communicating better with fellow employees. Although this evidence often concerns whether harassment is race based, here it indicates that the harassment was not severe or pervasive as the statute does not protect individuals against all manipulative or difficult co-workers. Title VII is not "a general civility code." *Vance*, 646 F.3d at 472 (quoting *Ford v. Minteq Shapes & Servs., Inc*., 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998))).

Finally, although the Plaintiff uses the words "threatening" and "angry" to describe Ambrose, none of the events described indicate that Ambrose ever physically threatened the Plaintiff or that the Plaintiff even felt physically threatened. Similarly, based on the complaints made to his superiors, it appears that Ambrose failed to have a material impact on the Plaintiff's ability to do his job. As described by the Plaintiff, Ambrose repeatedly tried to create road blocks to his successful completion of work tasks, the Plaintiff then created some work-around to nevertheless complete the task, and then Ambrose yelled at him for the work-around. But, according to the Plaintiff, the job was still completed. The Plaintiff reports that Ambrose complained up the chain about him but the Plaintiff was ultimately found not to have acted

inappropriately and was not reprimanded. Ambrose's conduct did not materially alter the conditions of the Plaintiff's employment; rather, it made his job at times somewhat more difficult and somewhat less pleasant. A reasonable jury could not find that Ambrose engaged in severe or pervasive harassment against the Plaintiff based on the evidence before the Court and the incidents about which Defendant Fluor knew or should have known.

Accordingly, because the Plaintiff has not presented evidence that could support a finding of severe or pervasive harassment, the Court will grant Defendant Fluor's Motion with regard to the Plaintiff's hostile work environment claim.

**B.      Title VII Retaliation**

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). When asserting a charge of retaliation under Title VII, a plaintiff may proceed under the direct or indirect method of proof. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method of proving retaliation, a plaintiff must present either direct or circumstantial evidence showing that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) a causal connection exists between the protected activity and the adverse action. *Id.* Under the indirect, burden-shifting method, a plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she was performing her job to her employer's legitimate expectations; (3)

she suffered an adverse action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*

Under both methods the Plaintiff must show that he took some statutorily protected action. Statutorily protected activity can include informal, internal complaints. *Davis v. Time Warner Cable of S.e. Wis., L.P.* 651 F.3d 664, 674 (7th Cir. 2011). However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). "Although an employee need not use . . . magic words . . . she has to at least say something to indicate her [protected status] is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated." *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (quotation marks omitted).

Defendant Fluor argues that the Plaintiff never took statutorily protected action. The Court, however, finds that the Plaintiff's March Complaint in combination with his verbal complaints constitutes evidence that could support a jury finding that he complained of racial discrimination. The Plaintiff complained that he was "working in a hostile environment," that he was being "harassed" and "discriminated against" by Ambrose. While these complaints could be read as "complaining in general terms," a Hispanic employee complaining about a white co-worker in these terms could support a reasonable inference in the Plaintiff's favor that he meant, and his superiors understood him at some point to mean, racial discrimination. *See Casna v. City of Loves Park,* 574 F.3d 420, 426 (7th Cir. 2009) (questioning a supervisor, "Aren't you being discriminatory?", constituted statutorily protected conduct for the purpose of an Americans with

Disabilities Act retaliation claim).

1.      *Direct Method of Proving Retaliation*

The Plaintiff appears to primarily argue his case by designating evidence supporting a direct theory of liability for retaliation [7] Under any route to avoiding summary judgment his firing constitutes an adverse action. Next he must provide evidence supporting a causal connection between his firing and his complaints about Ambrose. To do so, the Plaintiff seeks to rely on a "'convincing mosaic' of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." (Pl's Resp. 12, ECF No. 72 (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).) *See Smith v. Bray*, 681 F.3d 888, 901 (7th Cir. 2012) ("In the absence of an admission, a retaliation plaintiff may also satisfy the causation or motive element by presenting a convincing mosaic of circumstantial evidence that would support the inference that a retaliatory animus was at work") (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 737)) (quotation marks omitted). Such circumstantial evidence "may include 'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Harper v. C.R. England, Inc.*, — F.3d —, 2012 WL 2053574, at *5 (7th Cir. June 8, 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

---

[7] However, the Plaintiff's arguments concerning the various routes to liability under Title VII are somewhat muddled. The Plaintiff's brief does not always clearly delineate between when the Plaintiff presents evidence opposing summary judgment under the direct method or the indirect method or in support of a claim for retaliation or racial discrimination.

The Plaintiff points to two pieces of circumstantial evidence that, he argues, a jury could rely on in finding retaliation: 1) that the "Plaintiff was qualified for the 'new' consolidated material coordinator position but was passed over . . . in favor of a Caucasian male" (Pl.'s Resp. 13); and, 2) the suspicious timing of his firing six days after the filing of his complaint with HR on March 27.

The Plaintiff's first point cannot defeat summary judgment on a direct method because "circumstantial evidence under the direct method of proof . . . requires evidence leading *directly* to the conclusion that an employer was illegally motivated, without reliance on speculation." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012). The Plaintiff's evidence that his qualifications were superior to Ramey's would necessarily require the jury to speculate that, assuming the Plaintiff was better or as well qualified, the real reason for Ramey's selection was that the Plaintiff complained of discrimination or harassment in the workplace. The Plaintiff's evidence concerning his qualifications as compared to Ramey's does not permit an inference that Defendant Fluor retaliated against him. Similarly, the fact that Ramey was Caucasian and the Plaintiff Hispanic (or that Ramey did not complain about harassment in the workplace) does not constitute direct evidence of retaliation; to the contrary, such evidence is the very basis of the indirect, *prima facie* method of proof.

However, according to Seventh Circuit precedent, the Plaintiff's second piece of evidence, suspicious timing, can permit an inference of retaliation.

> It is well established that "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation

based on suspicious timing alone . . . does not support a reasonable inference of retaliation."). However, "together with other facts, [suspicious timing] can sometimes raise an inference of a causal connection." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008).

*Harper*, 2012 WL 2053574, at *5 (ellipsis omitted). In *Magyar*, the court found that, although the time between the plaintiff's complaints and her firing could be measured in several ways, the facts viewed in the light most favorable to the plaintiff could indicate that just nine days passed between her complaint and her firing. 544 F.3d at 772. The court found this time period, taken without facts indicating retaliation, was sufficient to raise an inference of a causal connection. *Id*. Thus, the question for the Court is whether "other facts" in this case allow the suspicious timing—the Plaintiff's firing about one week after filing the March Complaint—to raise a reasonable inference of a causal connection between the two.

The Court finds that the combined impact of evidence that the Plaintiff's superiors initially told him to ignore Ambrose's conduct and told him there was nothing they could do, that other suspicious and racially-charged events took place in the workplace in the time period leading up to his firing, that the Plaintiff's relationship with Ambrose further deteriorated during that time period, and that the Plaintiff testified that he saw Callahan and Ambrose meet for half an hour the day before he was fired,[8] could allow a jury to rely on the suspicious timing of his

---

[8] While the Court is not obligated to scour the record it is also not prohibited from relying on citations located in its own review of the record. *See Mayes v. City of Hammond,* 442 F. Supp. 2d 587, 598 (N.D. Ind. 2006) ("In instances in which the citation to the evidence of record is incorrect, but the Court comes across the proper citation in the course of reviewing the remaining facts, the Court will consider the facts to be supported by the correct citation."). In its discretion and in an effort to view the facts in the light most favorable to the Plaintiff, the Court relies on this evidence even though it was not explicitly referenced or cited in the Plaintiff's brief. (Pl.'s Dep. 381, ECF No. 64-2 ("I witnessed myself through that period where Mr. Ambrose came in at a certain time, while that human resource report was turned in, he went in the room . . . with Mr. Callahan . . . . [The] next day, they're telling me I am being let go.").)

firing to conclude there was some causal connection between the March Complaint and his being

fired. Accepting the Plaintiff's allegations as true, in the short time period—six days—between

his filing of the March Complaint and his learning that he would be fired, Ambrose called the

Plaintiff a spic and the Plaintiff saw Ambrose and Callahan meet. In the period leading up to the

filing of the March Complaint, the Plaintiff testified that when he did complain about

mistreatment by Ambrose he was told to continue doing his job, and various racially-charged

events took place in the workplace. The spic comment, the bean photograph, the two "puta"

comments, and the anti-Mexican email all constitute "bits and pieces" of evidence tending to

indicate that the Plaintiff's faced some racial hostility in the workplace and, therefore, though

ambiguous, could be relied on by a jury, with suspicious timing and the Plaintiff's complaints

about Ambrose's conduct that had no racial character on its face, to draw an inference of

retaliation.[9] *Harper,* 2012 WL 2053574, at \*5. The relative increase in these events as he

approached his firing and, in particular, after he filed a written complaint, supports this inference.

A jury could rely on the suspiciously short timing between his written complaint and his firing,

together with his testimony and these facts, to conclude that his firing was based on a retaliatory

motive.

      If an employee can support a case under the direct method of proof, an employer must

present evidence showing "unrebutted evidence that he would have taken the adverse

---

[9] The Court notes that an inference of retaliation based on these facts requires some speculation especially since there is no evidence that ties the decisionmaker himself to any of the racially-charged incidents. However, the Court sees no way in which a plaintiff could proceed on the basis of circumstantial evidence, as permitted by Circuit precedent, without any speculation, as Circuit precedent also appears to indicate. Recent Seventh Circuit case law continuing to cite the rule from *Maygar,* that suspicious timing along with other suspicious facts can be sufficient to prevent summary judgment, persuades the Court to resolve these ambiguities in the Plaintiff's favor. *See Harper*, 2012 WL 2053574, at \*5.

employment action against the plaintiff even if he had had no retaliatory motive" to win summary judgment. *Magyar*, 544 F.3d at 773 (quoting *Stone*, 281 F.3d at 644). Defendant Fluor seeks summary judgment on the basis of Callahan's testimony that he was already planning on firing the Plaintiff before he filed the March Complaint. However, Callahan's testimony is not conclusive as to when exactly he first considered firing the Plaintiff and therefore does not constitute unrebutted evidence resolving the question of whether the decision was made before or after the filing of the March Complaint. Viewed in the light most favorable to the Plaintiff, the relatively-short time period between his complaint and his firing was suspicious. Accordingly, the Court will deny summary judgment with respect to the Plaintiff's claim for Title VII retaliation under the direct method.

**2.** *Indirect Method of Proving Retaliation*

In its Reply, Defendant Fluor argues that the Plaintiff failed to make his case under the indirect method for retaliation. The Plaintiff in fact never cites a legal standard for, nor explicitly lays out an argument supporting, a case of retaliation under the indirect standard. However, the Plaintiff repeatedly makes statements in his brief arguing in favor of an indirect method of proving discrimination and retaliation under the statute. In fact, he appears to combine the two at times. For example, in the heading for his section on pretext he states: "Whether [Defendant Fluor's] proffered reason . . . is pretext for discrimination and retaliation is a question of fact for a jury to decide." (Pl.'s Resp. 17.) The Plaintiff then argues in that section that the "REAL cause" of his being fired was "having complained about Ambrose's harassment and

discrimination." (*Id.*) These statements only make sense if the Plaintiff intended to argue an indirect method of proof to support his retaliation claim. *See Magyar*, 544 F.3d at 773 (no pretext analysis if a plaintiff makes his case under a direct theory of liability rather a defendant must present "unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive") (quoting *Stone*, 281 F.3d at 644). Defendant Fluor is correct that the Plaintiff should have taken more care in his brief to explain which theory of liability he was asserting. Nevertheless, the Court will make all reasonable inferences in the Plaintiff's favor and will, therefore, determine here whether he designated evidence that could prevent summary judgment on a claim for retaliation under the indirect method.

As stated above, under the indirect method the Plaintiff must show that (1) he engaged in statutorily protected activity; (2) he was performing his job to her employer's legitimate expectations; (3) he suffered an adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected expression. *Metzger*, 519 F.3d at 681. The Plaintiff engaged in statutorily protected activity. The Plaintiff testifies, and Defendant Fluor provides no evidence to contradict, that he was performing his job to Defendant Fluor's legitimate expectations. The Plaintiff suffered an adverse employment action when he was fired. He has presented evidence that he was fired in the downsizing while another individual, who did not make similar complaints, was kept in a combined role. The Plaintiff has established a *prima facie* case of retaliation under Title VII. Defendant Fluor provided a non-discriminatory reason for its choice to promote Ramey to the combined position and fire the Plaintiff. Defendant Fluor asserts that Callahan needed to reduce staff and believed Ramey was

better qualified for the combined position than the Plaintiff.

By putting forward Callahan's testimony, evidence of a legitimate basis for firing the Plaintiff, Defendant Fluor shifted the burden back to the Plaintiff to designate evidence indicating that its proffered reason is untrue. "'The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (quoting *O'Leary v. Accretive Health, Inc*., 657 F.3d 625, 635 (7th Cir. 2011)). The Plaintiff "must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [Defendant Fluor's] asserted reason 'that a reasonable person could find [it] unworthy of credence.'" *Id.* (quoting *Boumehdi*, 489 F.3d at 792).

The Plaintiff argues that there is "ample evidence on the record" that a reasonable jury could rely on to find that Defendant Fluor's stated reason is untrue. (Pl.'s Resp. 17–18). The Plaintiff then relies on the following evidence to show pretext: 1) Ramey left the combined position less than a month after starting it and was replaced by Marvin King[10] who Defendant Fluor stated was originally laid off at the same time as the Plaintiff and King performed the Plaintiff's original duties rather than a consolidated position; 2) Callahan did not produce documentary evidence of when he made the decision to fire the Plaintiff and an email on April 1, 2009, sent to Callahan from Johnson is the first such evidence of the decision to fire the

_____

[10] The Plaintiff points to these similarly-situated individuals' status as non-Hispanics to support his claim. It is more appropriate in this context to think of these individuals as those that had not complained about racial harassment in the workplace.

Plaintiff[11]; 3) the Plaintiff was better qualified, or at least as qualified, to take on the combined position; 4) Callahan's statements were self-serving.

None of the evidence submitted by the Plaintiff taken individually or in combination would permit a jury finding in his favor on the issue of pretext. That Ramey left the combined position soon after receiving it does not provide evidence materially contradicting Callahan's testimony that he believed Ramey to be better qualified for the position than the Plaintiff and fired the Plaintiff on that basis. It is unclear how Ramey's independent decision making concerning his career could have any relevance to the truthfulness of Callahan's testimony. Similarly, Defendant Fluor's decision to hire King rather than the Plaintiff for a consolidated position[12] after Ramey left does not call into question Callahan's statements about his reasons for choosing Ramey over the Plaintiff at the time the Plaintiff was fired.

The Plaintiff argues that there is a credibility contest between his testimony and Callahan's testimony that must be decided by a jury. He relies on the fact that Defendant Fluor did not produce documentary evidence of when it made its decision, that Callahan could not remember exactly when he made the decision, that the earliest documentary evidence that

---

[11] The section of the Plaintiff's brief directly arguing the pretext issue lists only these first two grounds. The Court, making an inference in the Plaintiff's favor, will consider other arguments throughout his brief that might also indicate pretext.

[12] The Plaintiff relies on Ramey's deposition to indicate that King took over his prior position (rather than a consolidated one) after Ramey quit. (Pl.'s Resp. 6–7 (citing Ramey Dep. 39, ECF No. 72-3.).) Ramey stated that he trained King on the Plaintiff's prior role and not on his additional responsibilities. Defendant Fluor relies on affidavit testimony from Rick Hudgens that King was hired back to perform a consolidated role, just one consolidated with other responsibilities not belonging to Ramey. (Def. Fluor's Reply 15 (citing Hudgens Supp. Decl. ¶¶ 8–10).) There does not appear to be a material factual dispute in this regard because Ramey testified only to what he trained King to do, while Hudgens specifically testified as to King's responsibilities after Ramey left, a matter about which he appears to have personal knowledge.

Defendant Fluor can produce was sent soon after he filed the March Complaint, that Callahan's statements were self-serving, and that the Plaintiff was better qualified than Ramey. The Plaintiff, however, must show some evidence, above and beyond his own belief that he was discriminated against, to create a factual dispute for a jury; these arguments do not constitute such evidence. The lack of documentary evidence does not, in itself, call Defendant Fluor's explanation into question, nor does the existence of an email dated April 1 indicating that the Plaintiff would be fired but not containing any information concerning when the decision was made. *See Hill v. Potter*, 625 F.3d 998, 1004 (7th Cir. 2010) (finding a lack of documentary evidence to support employer's stated reasons for failure to hire not sufficient to meet plaintiff's burden to show pretext). The Plaintiff does not, for example, present evidence that Defendant Fluor was not engaged in layoffs at that time or that managers were not asked to consolidate positions like his. Such evidence would call into question the explanation; a lack of documentation alone does not.

The "self-serving" nature of Callahan's explanations for his actions does not create a material factual dispute simply because the Plaintiff questions them.[13] *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (when a party presents challenges to witness credibility without any additional facts to support its claims "summary judgment in favor of the

---

[13] The Plaintiff cites *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845 (7th Cir. 2007) for the proposition that when the Court is left with a credibility contest it must deny summary judgment. However, in *Pantoja* the plaintiff and defendant presented contradicting versions of when the plaintiff received an initial warning. That was a fact about which the plaintiff would have had personal knowledge. *Id*. at 850 (the plaintiff "has no recollection of this warning, and there is no documentation supporting it other than a reference to it on another warning dated April 23, 2002."). In this case, the Plaintiff would not have personal knowledge of when Callahan first considered consolidating his position and laying him

defendant is proper"). Finally, the Plaintiff's evidence that he was as-well or better qualified than Ramey (or King) ultimately could succeed only in calling into question the wisdom of Defendant Fluor's decision rather than its truthfulness.

Defendant Fluor submitted a legitimate basis for firing the Plaintiff. The Plaintiff failed to submit evidence upon which a jury could rely to find that Defendant Fluor's agents lied. The Court, therefore, will grant summary judgment in favor of Defendant Fluor on the Plaintiff's claim of retaliation brought under the indirect method.

**C.  Title VII Discrimination**

The Plaintiff argues that he was discriminated against on the basis of race and sets out his case under both a direct and indirect method. The Plaintiff's Response weaves together argument concerning retaliation and direct discrimination and direct and indirect methods of proof. Importantly, near the end of his brief the Plaintiff states, in a section concerning whether Defendant Fluor's reasons given for the firing were pre-textual, that he "asserts that [Defendant Fluor's] argument is mere pretext and that the REAL cause of [the] Plaintiff's termination was retaliation, and that he would not have been subject to the lay-offs BUT FOR having complained about Ambrose's harassment and discrimination." (Pl.'s Resp. 17.) The Plaintiff does not appear to argue that the real cause of his termination was his race (as an alternate theory) but rather, in his discussion of pretext, repeats his allegation that the basis was his complaints made about Ambrose's harassment.

---

off, thus, his own testimony that he believes Callahan is lying cannot, standing alone, create a material issue of fact for trial.

Importantly, the Plaintiff also did not argue a cat's paw theory of liability to tie Ambrose's conduct towards him directly to his firing. Under the "cat's paw" theory, a plaintiff can support a case for liability under Title VII with evidence "that another employee's impermissible bias infected a decision." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). The Plaintiff did not put forward any evidence, nor even an assertion, that Ambrose himself influenced the ultimate decision to fire him and the Court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel," *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011), or to "scour the record in search of evidence to defeat a motion for summary judgment," *Harney*, 526 F.3d at 1104.

The Plaintiff, nevertheless, argues that he was fired on the basis of his race under a direct and an indirect method of proof. But his statement that the real cause of his layoff was his complaints against Ambrose combined with his lack of argument, and scant evidence, tying Ambrose himself to the decision to fire him lead the Court to conclude that he either waived or failed to provide evidence supporting his claim of racial discrimination. Under a direct method of proof, his evidence fails because all his evidence tending directly to support the contention that he was discriminated against either stems from Ambrose's alleged conduct or that of unknown individuals and not from the conduct of those who made the decision to fire him or relates to his retaliation claim analyzed above.

Under the indirect method of proof, Defendant Fluor argues that it has put forward a non-discriminatory basis for his firing and that the Plaintiff must therefore indicate that this reason is pretextual. *See Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915–16 (7th Cir. 2007) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)); *see also Larson v. Portage*

*Twp. Sch. Corp.*, 293 F. App'x. 415, 418–19 (7th Cir. 2008) ("[W]here an employer offers a legitimate, nondiscriminatory reason for firing an employee, it simply 'doesn't matter' whether the plaintiff presented a prima facie case of discrimination.") (quoting *Brewer*, 479 F.3d at 915–16). To counter Defendant Fluor's non-discriminatory basis, the Plaintiff argues: that the reason for his firing was his "having complained about Ambrose's harassment and discrimination," that the record shows he was replaced by an individual outside his protected class, who left the consolidated job not long after beginning, that this individual's replacement was also outside the Plaintiff's protected class, and that there is no documentary evidence supporting Defendant Fluor's explanation for when and why it fired him. (Pl.'s Resp. 17–18, ECF No. 72.) As discussed above in the context of his retaliation claims, this evidence, taken together in the light most favorable to the Plaintiff, would not permit a jury finding that he suffered racial discrimination. His complaints center on Ambrose and Ambrose's conduct and he does not assert that Ambrose participated in the decision to fire him. Rather, he asserts that Defendant Fluor fired for him complaining about Ambrose's treatment of him. Simply put, this is a claim for retaliation, not for racial discrimination. The Court will grant Defendant Fluor's Motion with regard to the Plaintiff's prima facie claim of racial discrimination.

**CONCLUSION**

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendant Fluor's Motion for Summary Judgment [ECF No. 63]. The Court CONFIRMS a Telephonic Status Conference to be held on August 2, 2012, at 2:30 PM before Judge Theresa L. Springmann. The Court will initiate the call.

SO ORDERED on July 31, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION